NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0351n.06

No. 25-1936

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 05, 2026
KELLY L. STEPHENS, Clerk

TRAVIS KOTKE,

        Plaintiff - Appellee,

v.

ANDREW AGER,

        Defendant - Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: MOORE, NALBANDIAN, and MATHIS, Circuit Judges.

MOORE, J., delivered the opinion of the court in which MATHIS, J., concurred. NALBANDIAN, J. (pp. 21–22), delivered a separate dissenting opinion.

**KAREN NELSON MOORE, Circuit Judge.** Three Michigan state troopers responded to Plaintiff Travis Kotke's 911 call, in which he claimed his wife Stephanie had struck him.[1] When the troopers arrived at the Kotkes' residence, they separated the couple and interviewed both Kotke and Stephanie. Concluding that Kotke himself was the aggressor in the domestic dispute and had injured his wife's foot, they told him he was under arrest and sought to secure him. Kotke, who was holding his four-year-old son in his lap, refused the troopers' commands to release the child, and trooper Andrew Ager used a takedown maneuver to tackle and secure Kotke. As a result, Kotke sustained injuries. Kotke sued the troopers alleging various constitutional violations, and the district court granted summary judgment to the defendants on all counts except for an

---

[1]To avoid confusion, we refer to Travis Kotke as "Kotke" and Stephanie Kotke as "Stephanie" throughout our opinion.

excessive-force claim against Ager. Ager appealed, invoking our interlocutory jurisdiction to review the district court's denial of qualified immunity on that count. For the following reasons, we AFFIRM.

## I. BACKGROUND

Early in the morning of May 30, 2021, Kotke called 911 to report a domestic disturbance, telling the operator that his wife Stephanie was heavily intoxicated, had punched him in the face, and had thrown her wedding ring at him but it had hit their child. R. 28-3 (911 Event Report at 1) (Page ID #182). Three troopers—Ager, Tara LaMilza, and Chad Sheldon—arrived at Kotke's home shortly thereafter. R. 28-2 (Ager Event Report at 1) (Page ID #176). Ager was the trooper in charge, LaMilza was the secondary trooper, and Sheldon was a probationary trooper completing his field training. R. 28-17 (Sheldon Dep. at 12, 17) (Page ID #367, 369). Audio of the subsequent events was recorded on microphones linked to Ager's and LaMilza's dashboard cameras. *See* R. 28-4 (LaMilza Tr.) (Page ID #185–232); R. 28-5 (Ager Tr.) (Page ID #233–94).[2]

When the troopers began talking to Kotke and Stephanie, Stephanie told them that Kotke had "slammed [her] foot in the door." R. 28-4 (LaMilza Tr. at 5) (Page ID #190). Kotke responded, "Oh, that's not true." *Id.* at 14. Ager then escorted Stephanie outside to a waiting ambulance, while LaMilza remained inside with Kotke and the couple's four-year-old son. *Id.*

Kotke and Stephanie told conflicting stories about the night's events. Kotke told LaMilza that Stephanie had stayed up drinking after he went to bed and he had confronted her about it by pouring a can of her beer out in the sink, at which point Stephanie "lost it." *Id.* at 8 (Page ID

---

[2]Although we have cited the transcripts of the relevant dashcam audio recordings, we have verified the accuracy of those transcripts with the recordings themselves, and we note that neither party disputes the accuracy of the recordings or transcripts thereof.

#193).  He called Stephanie "the violent one" in the relationship, claiming that she punched him in the face and had thrown her wedding ring, which hit their four-year-old son in the face.  R. 28-4 (LaMilza Tr. at 8–9) (Page ID #193–94).  Kotke also told LaMilza then that he didn't know what happened to injure Stephanie's foot but admitted he had closed the door to the house when Stephanie ran outside.  *Id.* at 12–13 (Page ID #197–98).  After Stephanie stopped screaming, Kotke said, he let her back in the house and realized her hand and foot were bleeding.  *Id.* at 13–14 (Page ID #198–99).

In the meantime Stephanie was telling Ager a different story.  She said that Kotke had come "home high on fucken crack" late at night, thought someone was in their bed, and "started stabbing the mattress."  R. 28-5 (Ager Tr. at 4) (Page ID #237).  Stephanie explained that Kotke had thrown her cellphone out the door when she told him she would call 911, then slammed her foot in the door when she went to retrieve it.  *Id.* at 4–5 (Page ID #237–38).  Stephanie admitted she had been drinking and submitted to a blood-alcohol test, which gave a reading of around .11–.13.  *Id.* at 10–11, 13 (Page ID #243–44, 246).  When Ager asked her why she hit Kotke in the face, Stephanie repeatedly denied hitting him.  *Id.* at 5 (Page ID #238).

LaMilza and Ager then compared notes from the interviews and spoke with the 911 dispatcher to confirm their recollection of Kotke's call.  *Id.* at 13–16 (Page ID #246–49).  Ager had located Stephanie's phone outside by a tree, consistent with her story of Kotke throwing it.  *Id.* at 16–18 (Page ID #249–51).  LaMilza opined that Kotke was "on something" or "on meth" because he was sweating in the cold weather and "rapid fire talking."  *Id.* at 17 (Page ID #250).  LaMilza also noted that she could not see any evidence of injuries to Kotke's face.  R. 28–4 (LaMilza Tr. at 18) (Page ID #203).

After talking to Stephanie again, LaMilza and Ager jointly confronted Kotke. They asked about the possibility that he had been using drugs, noting his rapid speech and his sweating. *Id.* at 22–23 (Page ID #207–08). Kotke said that the sweating was due to "complete kidney failure," which meant that he would "sweat and [his] body temperature will not" decrease, but he would instead "get warmer and warmer until [he goes] into a grand mal seizure." *Id.* at 24–25 (Page ID #209–10). He told the troopers that "when [his] body temperature rises it doesn't come down unless [he] actually physically cool[s] [him]self down." *Id.* at 25 (Page ID #210). When the troopers informed Kotke that they found Stephanie's phone outside, he responded that she'd thrown it at him, but he did not explain how it had ended up outside by "the woods." *Id.* at 26 (Page ID #211). The troopers brought up the injury to Stephanie's foot twice. The first time Kotke said he did not know what happened, but he later said it "could be" that he'd closed the door on her foot. *Id.* at 27, 30–31 (Page ID #212, 215–16). Around this point, LaMilza told Kotke that the troopers thought Stephanie's story made more sense than Kotke's, explaining that he had no signs of injury and that the location of the cell phone matched Stephanie's account. *Id.* at 30 (Page ID #215).

About a minute later, when Kotke called Stephanie's injuries "aggressor wounds," Ager and LaMilza made it clear to Kotke that they planned to arrest him. *Id.* at 32 (Page ID #217). Kotke reacted with apparent disbelief, frustrated that he was being arrested even though he had called 911. *Id.* at 32–33 (Page ID #217–18). He asked to call his mother so she could take care of his son and the troopers gave him an opportunity to do so, but Kotke's mother didn't answer her phone. *Id.* at 32–34 (Page ID #217–19). In the meantime, Kotke asked what charge he was being arrested on, and Ager told him "domestic violence." *Id.* at 34 (Page ID #219).

At this point, Kotke was still holding his son in his lap, and he was seated in a chair in his house. R. 28-18 (Kotke Dep. at 120, 127) (Page ID #396, 399). Attempting to execute the arrest of Kotke, LaMilza attempted to coax Kotke's son out of his lap, telling him "come on buddy." R. 28-4 (LaMilza Tr. at 35) (Page ID #220). Kotke refused to allow the troopers to separate him and his son, shouting "[n]o, you are not taking my son from me! You are not doing this!" and asked for another chance to call his mother to pick up his son. *Id.* Ager told Kotke to let go of his son, but he refused those commands. *Id.*; R. 28-18 (Kotke Dep. at 118) (Page ID #394). Kotke said in his deposition that he refused because he was "in papa bear protective mode" with his son, and he "didn't agree with their decision" to arrest him. R. 28-18 (Kotke Dep. at 117–18) (Page ID #393–94). Despite those loud verbal objections and noncompliance, Kotke did not physically resist the troopers in any way. *Id.* at 118–20 (Page ID #394–96). According to Kotke, Ager then "tackled" him and his son together and gained control of Kotke's person. *Id.* at 120 (Page ID #396). This "tackling process," described by Kotke as the "intense part of the arrest," did not last more than ten seconds, after which Ager brought Kotke back to his feet. *Id.* at 125–26 (Page ID #397–98). During this "intense part," Kotke screamed: "No! Fuck you, you['re] not doing this to us! No! No! He's my best friend! No fuck, Ahhh! Ahhh!" R. 28-4 (LaMilza Tr. at 35) Page ID #220). Ager testified that he used a "straight arm bar" takedown technique to handcuff Kotke, and also "utilized the lockup" which included "utilizing a knee in the upper right back area." R. 28-15 (Ager Dep. at 67, 96) (Page ID #356, 358). At some point in the process, Trooper Sheldon was able to take hold of Kotke's son. *Id.* at 67 (Page ID #356).

After his arrest, Kotke was charged with one count of aggravated domestic violence, one count of interfering with electronic communications, and two counts of resisting and obstructing

a police officer. *See* R. 28-14 (Register of Actions at 1–2) (Page ID #346–47). He eventually pleaded guilty to one count of attempted resisting and obstructing an officer, and the other charges were dismissed. *Id.* at 4–5 (Page ID #349–50).

Kotke later brought this action against all three troopers, which included five counts alleging (1) excessive force in the execution of his arrest; (2) false arrest and imprisonment; (3) unreasonable search/seizure; (4) intentional infliction of emotional distress; and (5) malicious prosecution. R. 19 (2d Am. Compl. ¶¶ 41–63) (Page ID #86–89). After discovery, the defendants moved for summary judgment, invoking qualified immunity. *See* R. 28 (Mot. for Summ. J. at 19) (Page ID #153). The district court granted summary judgment for all defendants on all counts except for Count I (excessive force) as against Ager. R. 49 (Op. & Order at 41) (Page ID #910). On the false arrest, unreasonable search/seizure, and malicious-prosecution counts, the district court granted summary judgment because the troopers "reasonably believed they had probable cause to arrest [Kotke] for domestic violence based on the facts before them." *Id.* at 18 (Page ID #887). On Count I, however, the district court determined that "viewing the facts in the light most favorable to [Kotke], there [was] a question of fact whether Ager used excessive force while arresting him." *Id.* at 33 (Page ID #902). Finding also that "[t]he right not to be subjected to an arm-bar takedown when passively resisting arrest for minor crimes and posing little threat to arresting officers was clearly established," the district court denied Ager's qualified-immunity defense. *Id.* at 33–34 (Page ID #902–03). Ager appealed. R. 53 (Notice of Appeal) (Page ID #918).

## II. ANALYSIS

### A. Standard of Review

"We review de novo a district court's denial of a defendant's motion for summary judgment on qualified immunity grounds." *King v. City of Rockford*, 97 F.4th 379, 389 (6th Cir. 2024) (quoting *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013)). "In this context, summary judgment is . . . appropriate unless the evidence, 'viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established.'" *Id.* at 390 (quoting *Kovacic v. Cuyahoga Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 695 (6th Cir. 2013)). In an interlocutory posture, "[w]e have jurisdiction to review" the district court's "decision[] 'only to the extent' the appeal 'turns on an issue of law.'" *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (quoting *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020)). This means we lack jurisdiction at this juncture to hear "appeals challenging . . . a district court's determination about what factual issues are 'genuine,'" but we may consider whether "the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish" a breach of clearly established law. *Klein v. Long*, 275 F.3d 544, 549 (6th Cir. 2001) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999)). Furthermore, when legal and factual issues "are intertwined, [we] can ignore arguments that rely on disputed facts and resolve the legal issue on a given set of facts." *King*, 97 F.4th at 390.

### B. Factual Issues and Jurisdiction

We begin by resolving several challenges that Kotke lobs at Ager's framing of the facts. *See* D. 15 (Appellee Br. at 7) (alleging Ager's use of "unsupported factual contentions"). These

include whether: (1) Kotke knew "he was being arrested for domestic violence"; (2) "officers reasonably believe[d] [Kotke] was high on drugs"; (3) "any commands [were] given to release a child"; (4) "any commands [were] given" at all; (5) Kotke "refuse[d] any commands" (6) Kotke was "verbally belligerent"; (7) Kotke was "physically agitated." *Id.* at 7–8. Kotke argues, without specifically disputing our jurisdiction over this appeal, that "[t]hese are not the questions to be answered here." *Id.* at 8.

Though we would lack jurisdiction to consider the district court's determination that any of these factual issues were genuine, *see Klein*, 275 F.3d at 459, several of these issues are not in dispute and some were addressed by the district court's opinion. First, there is no genuine dispute of fact that the troopers told Kotke he was under arrest for domestic violence. Kotke asked the troopers "what charge are you guys arresting me on?" R. 28-4 (LaMilza Tr. at 34) (Page ID #219). Ager responded by saying "[d]omestic violence." *Id.* Nowhere in the record, moreover, does Kotke assert that he *did not* know he was under arrest or that the troopers suspected him of domestic violence.

The district court also resolved the second issue, whether the troopers reasonably believed Kotke was on drugs, in Ager's favor. In discussing the troopers' reasonable finding of probable cause to believe that Kotke had committed domestic violence, the district court focused on their observations consistent with Stephanie's claim that Kotke was high on drugs. The district court credited audio evidence demonstrating that the troopers "deemed" Kotke's "sweating profusely (despite the cold weather) and talking rapidly . . . consistent with drug use," R. 49 (Op. & Order at 18) (Page ID #887). Though Kotke provided the troopers with an explanation for his sweating based on his description of kidney failure, the question at issue is not the actual cause of his

sweating. It is whether, from the perspective of a reasonable officer at the scene, the belief that he was high on drugs was reasonable. The district court found that just as the troopers could have reasonably disbelieved Kotke's claim that Stephanie was the aggressor, they could have believed Stephanie's account of Kotke's drug use. Where, as here, Kotke simply adopts the district court's factual determinations on appeal and does not point to record facts inconsistent with those findings, *see* D. 15 (Appellee Br. at 3–4), we may accept those facts "as determined by the district court." *Heeter*, 99 F.4th at 911.[3]

The same goes for issues (3)–(5) listed above. Kotke acknowledged in his deposition that the troopers asked him to release his son so he could be arrested, but that he "[v]erbally refused to follow those commands." R. 28-18 (Kotke Dep. at 118) (Page ID #394). We may, therefore, consider these facts, which form part of the case "as alleged by the plaintiff." *Heeter*, 99 F.4th at 911.

We need not, however, accept Ager's characterization of Kotke as "verbally belligerent and physically agitated." D. 14 (Appellant Br. at 17). It is undisputed that Kotke expressed his exasperation and disagreement with the troopers' decision to arrest him, verbally indicated that he would not let go of his son, and used foul language. R. 28-4 (LaMilza Tr. at 34–35) (Page ID #219–20). Although the adjective "belligerent" can connote mere argumentation, which would be accurate, the word could also be read to imply a degree of "hostility" or "combativeness" that is in dispute here. *See Belligerent*, Merriam-Webster, https:/www.merriam-

---

[3]Kotke also cites the statement of facts in his complaint. D. 15 (Appellee Br. at 3–4). We may not consider his complaint's allegations at the summary-judgment stage because "*pleadings are not evidence.*" *Shreve v. Franklin County*, 743 F.3d 126, 136 (6th Cir. 2014); *see also* Fed. R. Civ. P. 56 advisory committee's notes to the 1963 amendment ("The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").

webster.com/dictionary/belligerent. Nor does the undisputed record evidence establish that Kotke was "physically agitated." The dashcam footage includes only the audio of his encounter with the troopers. Kotke was seated when the incident in question occurred. R. 28-18 (Kotke Dep. at 120) (Page ID #396). And Kotke testified in his deposition that he never physically resisted the troopers. *Id.* at 118–19 (Page ID #394–95). We accept only these facts, not Ager's gloss on them, for purposes of this appeal.

These disputes over the correct characterization of Kotke's actions are minor, however, and do not go to the ground-level facts that form the basis of Kotke's allegations. We therefore focus on resolving the legal questions based on the undisputed facts viewed in the light most favorable to Kotke. *See King*, 97 F.4th at 390.

## C. Qualified Immunity

As we have noted, qualified immunity is appropriately denied where the facts, "viewed in the light most favorable to the plaintiff, would permit a reasonable jury to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *King*, 97 F.4th at 390 (quoting *Kovacic*, 724 F.3d at 695). Though Ager's appeal addresses only the latter prong, *see* D. 14 (Appellant Br. at 2), we begin with a discussion of the alleged constitutional-right violation to aid in properly framing our analysis.

The Fourth Amendment proscribes "unreasonable seizures of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). At the same time, "the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. And although "[t]he reasonableness of an officer's use of force" in effectuating an arrest "depends on the totality of the circumstances," "three main factors frame the inquiry: 'the severity

10

of the crime at issue'; 'whether the suspect poses an immediate threat to the safety of the officers or others'; and 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Franke v. Janes*, 168 F.4th 797, 805 (6th Cir. 2026) (quoting *Graham*, 490 U.S. at 396). In applying these factors, "we consider the reasonableness of an officer's conduct through an objective lens, looking at the circumstances from the perspective of a reasonable officer on the scene," and recognize that circumstances like these "require 'split-second judgments' about the degree of force called for." *Id.* (quoting *Graham*, 490 U.S. at 397). But the excessive-force inquiry "has no time limit." *Barnes v. Felix*, 605 U.S. 73, 80 (2025). While the situation at the precise time the force was used "will often be what matters most," the "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.* So "[t]he history of the interaction, as well as other past circumstances known to the officer . . . may inform the reasonableness of the use of force." *Id.* at 80–81.

The first *Graham* factor—the severity of the offense—weighs against Kotke's claim. In considering this factor, we evaluate whether the crime for which an individual is arrested is "particularly serious" or "involve[es] violence." *King*, 97 F.4th at 394. When Kotke was booked, the offense listed was a domestic-violence misdemeanor under Mich. Comp. Laws § 750.81(2). R. 28-13 (Pretrial Release Order) (Page ID #329); R. 28-19 (Police Report at 1) (Page ID #403). When he was charged, the count was amended to a felony offense under Mich. Comp. Laws § 750.81a(3). R. 28-14 (Register of Actions). The former offense involves "assault[] or assault[] and batter[y]," Mich. Comp. Laws § 750.81(2), and the latter requires "assault[] . . . inflict[ing] serious or aggravated injury," *id.* § 750.81a(2). Because most domestic-violence statutes, like these, involve the use or threatened use of interpersonal violence, we have held that an officer's

11

reasonable belief that a person committed domestic violence can support the use of force in effecting an arrest. *Franke*, 168 F.4th at 806–07 (citing *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 606, 609–10 (6th Cir. 2020); *Goodrich v. Everett*, 193 F. App'x 551, 552, 555 (6th Cir. 2006)).

The district court found differently by focusing not on the nature of the offense but on its classification as a misdemeanor. R. 49 (Op. & Order at 31) (Page ID #900). Although we have at times framed the "inquiry by focusing on the classification of the offense, i.e., misdemeanor or felony," such considerations are secondary to the violent nature of the offense. *Shumate v. City of Adrian*, 44 F.4th 427, 440–41 (6th Cir. 2022). That is why in *Shumate* we held that "[e]ven if" there was "probable cause to believe [the] [p]laintiff committed a felony, there was minimal (if any) connotation of violence" that would justify the use of force. *Id.* at 441. Focusing on the misdemeanor/felony distinction also makes little sense here because the only difference between the two domestic-violence offenses under Michigan law is whether the defendant has a prior domestic-violence conviction. Mich. Comp. Laws §§ 750.81(2), 750.81(5), 750.81a(2)–(3). From the perspective of a reasonable officer, the two involve the exact same violent conduct.

The second *Graham* factor, by contrast, supports Kotke because "a reasonable officer in [Ager's] position would [not] have been justified in perceiving that [Kotke] posed an immediate threat to officer safety." *Shumate*, 44 F.4th at 443. Indeed, Ager does not appear to contest the district court's determination that Kotke's "actual verbal resistance 'betrayed no intent to injure'" the troopers. R. 49 (Op. & Order at 30) (Page ID #899) (quoting *Shumate*, 44 F.4th at 444) (citation modified).

12

The third *Graham* factor also largely favors Kotke. Though Ager is correct that Kotke's precise conduct does not fit neatly into our caselaw, it is clear that Kotke was not actively resisting arrest. "If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more," such as "verbal hostility or physical resistance." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). Verbal hostility, however, does not mean mere argumentativeness or verbal expressions of noncompliance. In *Kent v. Oakland County*, 810 F.3d 384, 387–88 (6th Cir. 2016), officers sought to facilitate an effort by medical first responders to resuscitate Kent's recently deceased father. Kent vociferously objected, yelling at the officers and first responders that they could not use a defibrillator on his father. *Id.* at 388. Kent then refused to comply with commands to "calm down" and "lower his hands," and the officers tased him. *Id.* Despite his yelling and objections, we held that Kent's conduct did not bear the hallmarks of active resistance. *Id.* at 393–94. Although he certainly did not offer "polite responses" to the officers' commands, his yelling was not directly threatening and did "not resemble the 'continued resistance and hostility' often present in our active resistance cases." *Id.* at 393–94 (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 325–26 (6th Cir. 2015)). Similarly, the plaintiff in *Shumate* verbally confronted an officer with whom he had had a prior negative encounter. 44 F.4th at 434–35. When the officer asked Shumate to put his hands behind his back and submit to arrest, Shumate stepped away and lobbed foul language at the officer. *Id.* at 435. We held that "Shumate's verbal jabs and rude hand gestures were not threatening in a manner that would amount to active resistance absent something more, such as overtly threatening language." *Id.* at 448; *see also Goodwin*, 781 F.3d at 324

13

(concluding that plaintiff's "single statement that he would not leave his apartment" after being commanded to do so did not rise to level of active resistance).

The facts here, viewed in the light most favorable to Kotke, fall short of the threshold our caselaw sets for active resistance. There is no dispute that he disobeyed the troopers' order to release his son so they could arrest him. And there is no dispute that he expressed his disagreement with the order verbally, yelling "[n]o, you are not taking my son from me! You are not doing this!" R. 28-4 (LaMilza Tr. at 35) (Page ID #220). But the fact that Kotke "refused to comply with an officer's command and verbally indicated as much," even if he used strong and forceful language, does not necessarily suggest "'volitional and conscious defiance.'" *Kent*, 810 F.3d at 392–93 (quoting *Eldridge*, 553 F. App'x at 534).

We agree with the district court that a jury, considering the *Graham* factors and the totality of the circumstances, could find Ager's use of a straight-arm bar takedown maneuver on Kotke was objectively unreasonable. Although the troopers had probable cause to believe Kotke had committed a violent crime, he had not exhibited signs of physical violence or directly threatened any of the troopers on the scene over the course of more than half an hour. At the time of the takedown, Kotke was seated, had his four-year-old son in his lap, and had not made any verbal or physical threats toward the troopers. Moreover, the period of time between LaMilza's first entreaty to Kotke's son and Ager's use of force was about 15-20 seconds. R. 28-4 (LaMilza Tr. at 35) (Page ID #220). Facing this situation, Ager decided to use a straight-arm bar takedown. This maneuver involves "thrust[ing] the [arrestee] to the floor face first," *Meirthew v. Amore*, 417 F. App'x 494, 496 (6th Cir. 2011), and in this case also involved Ager pressing his knee into Kotke's shoulder, R. 28-15 (Ager Dep. at 67) (Page ID #356). It is the kind of significant force that

14

frequently results in injury. *See, e.g.*, *Meirthew*, 417 F. App'x at 496 (facial fractures and head lacerations); *Sevenski v. Artfitch*, Nos. 21-1391/1402, 2022 WL 2826818, at \*1 (6th Cir. July 20, 2022) (broken nose, broken arm, fractured ribs, dislocated elbow); *Bozung v. Rawson*, 439 F. App'x 513, 515–16 (6th Cir. 2011) (facial lacerations); *Ryan v. Hazel Park*, 279 F. App'x 335, 337 (6th Cir. 2008) (eye contusions); *Fox v. DeSoto*, 489 F.3d 227, 232 (6th Cir. 2007), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) (cuts and eye bruising). Though the situation was "tense, uncertain, and rapidly evolving," there remains an issue of fact "'whether the totality of the circumstances justifie[d] [this] particular sort of . . . seizure.'" *Graham*, 490 U.S. at 396–97 (quoting *Tennessee v. Garner*, 471 U.S. at 1, 8–9 (1985)) (citation modified).

Ager's appeal, however, focuses on the qualified-immunity inquiry's second part. We must therefore consider whether the violation of Kotke's Fourth Amendment rights was clearly established. "A right is 'clearly established' if 'every reasonable official would have understood that what he is doing violates that right.'" *Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 694 (6th Cir. 2022) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). This inquiry requires us to define the right at issue at the appropriate level of generality and determine whether "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). We may not define the right at a level that is too general (like "the right to be free from excessive force"), as that would "risk[] collapsing the two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry *always* to answer the clearly established inquiry." *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012). But "just as a court can generalize too much, it can generalize too little." *Id.* We have therefore "recognized that '[a] court need not

have previously held illegal the conduct in the precise situation at issue because officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 427–28 (6th Cir. 2017) (quoting *Sutton v. Metro Gov't of Nash. & Davidson Cnty.*, 700 F.3d 865, 876 (6th Cir. 2012)). "All that is required is a sufficiently analogous case (or cases) from which a 'reasonable official would understand that what he is doing violates that right.'" *Rhodes v. Michigan*, 10 F.4th 665, 679 (6th Cir. 2021) (quoting *Anderson*, 483 U.S. at 640).

Ager's proposed definition—Kotke's "right not to be subjected to a straight arm-bar takedown when he knew he was being arrested for domestic violence, and yet, became verbally belligerent and hostile while refusing to let go of his four-year old son such that the officers could not arrest [him]"—takes a much narrower view than is typical in our qualified-immunity cases. D. 14 (Appellant Br. at 23). Defining the right in this manner would effectively require that Kotke point to an exact match of the fact pattern here, which the law does not mandate. *See Rhodes*, 10 F.4th at 679.

Contrary to Ager's hyper-specific definition, the facts here fit comfortably into the rubric of our clearly established excessive-force caselaw. "It has been clearly established for several years in the Sixth Circuit that an officer cannot use injurious physical force to subdue a suspect that is not actively resisting arrest." *Meadows v. City of Walker*, 46 F.4th 416, 422 (6th Cir. 2022); *see also Reed v. Campbell County*, 80 F.4th 734, 750 (6th Cir. 2023) ("It is clearly established law that officers may not use gratuitous violence against individuals who are not actively resisting."). Put differently, "cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Sevenski*, 2022 WL 2826818, at

16

*6 (quoting *Baker v. City of Hamilton*, 471 F.3d 601, 608 (6th Cir. 2006)).  And this body of caselaw includes cases predating Kotke's 2021 arrest.  *See Coffey v. Carroll*, 933 F.3d 577, 589 (6th Cir. 2019); *Griffith v. Coburn*, 473 F.3d 650, 659–60 (6th Cir. 2007); *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006).

Once again viewing the facts in the light most favorable to Kotke, and relying on our analysis above, it should have been clear to Ager that Kotke was neither actively resisting nor posing a significant safety risk to the troopers.  Consider first the question of Kotke's resistance.  Kotke, who was seated in the moments leading up to the takedown, did not take any physical action that could be reasonably viewed as actively resisting arrest.  His words would reasonably be understood as an expression of his disbelief or frustration—whether warranted or not—at his arrest.  They do not begin to approach the "overtly threatening language" that could justify the use of injurious or disabling force.  *Shumate*, 44 F.4th at 447–78.  And even if Kotke's failure to release his son after being ordered to do so could be seen as more than passive resistance (it should not), he lacked "[]sufficient time in which to comply with [the troopers'] command[s]" in the fleeting seconds leading up to the takedown.  *Groth v. Hill*, No. 25-1053, 2026 WL 674352, at *6 (6th Cir. March 10, 2026).

It was also clear that Kotke "pose[d] no safety risk" at the time of the takedown.  *Sevenski*, 2022 WL 2826818, at *6 (quoting *Baker*, 471 F.3d at 608).[4]  By the time Ager used the straight-

---

[4]The lack of such risk also separates this case from those the dissent relies on.  In *Shanaberg v. Licking County*, 936 F.3d 453, 456 (6th Cir. 2019), force was not unreasonable because the plaintiff "was reported to be armed and dangerous" and confronted the officers in a "threatening position."  *See also Caie v. West Bloomfield Township*, 485 F. App'x 92, 96–97 (6th Cir. 2012) (plaintiff had professed a "desire to provoke the officers into using deadly force," and physically resisted before the use of taser).  Nor do the facts here, taken in the light most favorable to Kotke, present a "deliberate act of defiance using one's own body," language we have used to describe conduct such as "locking [one's] arms tightly under [one's] body while kicking and screaming so as to avoid arrest."  *Eldridge*, 533 F. App'x at 534–35.

arm bar takedown, the troopers had been at Kotke's house for over 30 minutes without incident. Kotke was outnumbered and in a comparatively vulnerable position, seated in a chair with his four-year-old son in his lap, relative to the three troopers standing by him. There was no indication that Kotke posed any immediate danger to his son. In fact, in the moments leading up to his arrest, Kotke was seeking to secure care for his son by attempting to contact Kotke's mother.

Finally, it was clearly established that an arm-bar takedown constitutes the kind of injurious "significant use of force," which can be "more than [is] necessary . . . to take control of the situation." *Sevenski*, 2022 WL 2826818, at *5; *see also McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013); *Meirthew*, 417 F. App'x at 499. As early as 2008, we held that it was clearly established that an incident of noncompliance punctuated with "verbal sparring . . . would permit a jury to conclude that [an officer's] use of force in throwing [the plaintiff] to the floor was disproportionate to any threat [the officer] faced." *Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008). In sum, "our precedent clearly establishes that taking [Kotke] to the ground . . . when he did not actively resist arrest constitutes excessive force." *Meadows*, 46 F.4th at 422.

We recognize that the troopers' suspicion that Kotke had committed domestic violence would, in some cases, have muddied the waters sufficiently to justify significant or injurious force. But suspicion of a domestic-violence offense, even a serious one, is not a blank check for the use of force. In *Franke*, we recently denied qualified immunity even though the plaintiff's suspected domestic-violence offense "favor[ed]" the defendant. 168 F.4th at 807. And the facts here are a far cry from the cases where such an offense justified the use of significant force. In *Kapuscinski*, the officers walked in on an apparent domestic assault and reasonably believed a woman's life was

in danger. 821 F. App'x at 606. And in *Goodrich*, unlike here, "a reasonable officer . . . would have interpreted Goodrich's actions as an attempt to evade the police." 193 F. App'x at 556.

Ager's arguments to the contrary miss a forest of clearly established law for a smattering of trees. Yes, Kotke's domestic-violence charge may not have been "minor," D. 14 (Appellant Br. at 26) (quoting *Graham*, 490 U.S. at 396–97), but a serious offense does not by itself justify any measure of force. Yes, an officer "must not only consider the threat that the suspect poses to the officers themselves, but also to *others*," *id.*, but the facts here viewed in the light most favorable to Kotke do not indicate that he posed an immediate threat to his son. Yes, "law enforcement surely has an interest in efficiently securing a suspect," *id.* at 27 (quoting *Williams v. Sandel*, 433 F. App'x 353, 362 (6th Cir. 2011)), but these principles are part and parcel of the *Graham* framework we apply here. Though this interest might have justified some measure of physical intervention to effectuate Kotke's arrest, it did not warrant "injurious physical force." *Meadows*, 46 F.4th at 422. And yes, the officers may have "reasonably believed that Kotke was high on drugs." D. 14 (Appellant Br. at 27) (citing *Parsons v. City of Ann Arbor*, No. 22-1338, 2023 WL 3413898, at *3 (6th Cir. May 12, 2023)). But in *Parsons*, the case Ager relies on, the force used was justified not primarily based on the plaintiff's intoxication, but on the ground that he "had just struck another individual in the face," "acted aggressively, failed to follow an officer's commands, and" was "trying to flee." 2023 WL 3413898, at *3. Each of Ager's arguments attempts to undermine the principles outlined above as "[in]sufficiently specific" to clearly establish a constitutional violation. *Meadows*, 46 F.4th at 423. Because our precedent instructs otherwise, *id.*, Ager was "on notice that his specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*,

595 U.S. 1, 6 (2021).  So we decline Ager's invitation to reverse the district court's denial of qualified immunity as to him on Count I.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of summary judgment based on qualified immunity as to Ager on Count I of Kotke's amended complaint, and REMAND for further proceedings.

**NALBANDIAN, Circuit Judge, dissenting.** Two years before the events in this case, I wrote a published concurrence in an excessive-force case. *See Shanaberg v. Licking County,* 936 F.3d 453, 458 (6th Cir. 2019) (Nalbandian, J., concurring). Although I suspected that the police conduct in that case was likely unconstitutional, I concluded that the law on when the police could use force on a non-compliant criminal suspect (there, a taser) was unclear—specifically as it applied in cases involving verbal belligerence and non-compliance. Because I'm not convinced that the law was any more clear two years later, even as applied to the facts viewed in the light most favorable to Kotke here, I respectfully dissent. If anything, the majority's holding in *Shanaberg* that the police acted constitutionally cuts against Kotke—likely on the "merits" but surely on whether the law was clearly established.

To start, Ager's conduct was likely constitutional. Two of the three *Graham* factors weigh in favor of constitutionality here. First, the police suspected Kotke of domestic violence. And domestic violence can be a serious crime. *See Franke v. Janes*, 168 F.4th 797, 806 (6th Cir. 2026) ("Domestic-violence calls can . . . often provide grounds to use force."). Second, Kotke actively resisted by verbally accosting the arresting officers and refusing to physically submit to arrest. The uncontroverted facts[1] establish that he hurled obscenities at the arresting officers and refused to physically let go of his son—thereby preventing officers from arresting him without force. We've concluded that suspects actively resisted arrest based on similar combinations of verbal hostility and some element of physical noncompliance. *See, e.g., Shanaberg*, 936 F.3d at 456

---

[1] It's true that, unlike in *Shanaberg*, the video here leaves much to be desired. But the audio alone establishes the relevant sequence of events and makes clear that no constitutional violation occurred. Officers told Kotke that he was under arrest, Kotke grew restless and verbally belligerent, then he refused to allow the officers to separate him from his son, and finally Ager applied force.

(verbal hostility and refusal to lie down); *Caie v. West Bloomfield Township*, 485 F. App'x 92, 94, 96–97 (6th Cir. 2012) (verbal hostility and refusal to move arms from underneath body); *see also Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (noting that noncompliance, paired with "a deliberate act of defiance using one's own body," can amount to active resistance).[2]

Of course, this case presents a nuance. The arresting officers needed Kotke to release his child so that they could arrest him. His refusal was an intermediate step to effectuating the arrest, not a final physical act of noncompliance. I don't think this nuance moves the needle on the constitutional violation because, as a practical matter, the officers couldn't arrest Kotke while he held his child.

But in any event, we haven't decided a case since *Shanaberg* that clearly establishes that a violation occurred on these facts.

For these reasons, I respectfully dissent.

---

[2] The majority distinguishes *Shanaberg* on two grounds: (1) that the plaintiff there had been reported as armed and dangerous, and (2) that he had confronted the officers in a threatening position. To be sure, the *Shanaberg* majority noted that the plaintiff "was a suspect who was reported to be armed and dangerous and who was verbally belligerent in response to reasonable requests to further officer safety by moving to a less threatening position before handcuffing." 936 F.3d at 456. And yes, lying flat on one's stomach is less threatening than being on one's knees with hands up. But just as that was true in *Shanaberg*, it was true here—Kotke could have made himself less threatening by simply submitting himself to the officers for arrest, as they asked. And, of course, Kotke was "verbally belligerent." *Id.*

It's also true that the *Shanaberg* majority noted that the plaintiff was "reported to be armed and dangerous." *Id.* But it's unclear how much work that did in the *Shanaberg* majority's analysis—or how much work it ever does. For example, in *Correa v. Simone*, we denied qualified immunity for an officer who used a taser against a plaintiff who refused to drop to the ground even though the plaintiff was wanted for assault and was reported to be armed. 528 F. App'x 531, 534–36 (6th Cir. 2013). That's not to say that the police ought not to be given more leeway when they think someone is armed—they should. It's just to say that this is another instance where our law lacks clarity.